**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy (#134180)
Michael Goldberg (#188669)
Robert V. Prongay (#270796)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile:  (310) 201-9160

**POMERANTZ LLP**
Patrick V. Dahlstrom (*Pro Hac Vice*)
Louis C. Ludwig
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE ARROWHEAD RESEARCH CORPORATION SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>    ALL ACTIONS | Master File No. 2:14-cv-07890-CBM-ASx<br><br>CLASS ACTION<br><br>Hon. Consuelo B. Marshall<br><br>**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

Lead Plaintiff Noelle M. Strogoff, on behalf of the Strogoff Family Trust U/D/T ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint the following upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, inter alia: (a) review and analysis of relevant filings made by Arrowhead Research Corporation ("Arrowhead" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Company; (d) statements of Confidential Witnesses ("CWs"); and (e) information readily obtainable on the Internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their control.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all persons and entities, other than Defendants, who purchased the common stock of Arrowhead during the period August 12, 2014 through October 8, 2014, inclusive (the "Class

Period"), seeking to recover damages caused by Defendants' violations of federal securities laws (the "Class").

2.     Arrowhead is a biopharmaceutical company whose main business is developing RNA Interference ("RNAi") therapeutics.  RNAi is a process by which the RNA molecules prevent gene expression and thereby destroys specific micro-RNA ("mRNA") molecules.  Arrowhead's focus is to develop drugs that target the RNAi mechanism that will suppress disease-causing genes.

3.     In 2011, Arrowhead acquired F. Hoffmann-La Roche AG ("Roche")'s entire RNAi portfolio, which included more than forty scientists working at Roche's Madison, Wisconsin site; IP rights from Alnylam Pharmaceuticals ("Alnylam"); a licensing deal with Tekmira Pharmaceuticals Corporation ("Tekmira"); and Roche- Madison's delivery platform.  At the time, *Fierce Biotech* commented that through the Roche acquisition, "[t]he little biotech immediately heralded its arrival as one of the world's biggest players in the troubled RNAi field."

4.     A drug called ARC-520 is Arrowhead's "lead clinical candidate," is crucial to its business and operations, and constitutes a core operation of the Company.  Thomas Wei, an analyst with Jefferies & Co., noted in late 2013 that most of Arrowhead's then-current value was attributable to ARC-520.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

5.     Indeed, according to a former Arrowhead employee, ARC-520 represented Arrowhead's first foray into clinical testing.

6.     ARC-520 is an RNAi therapeutic that targets the hepatitis B virus ("HBV") for treating chronic hepatitis B, a viral infection that can cause cirrhosis or cancer of the liver.

7.     Hepatitis B has been a chronic infection for more than thirty years and has endured despite therapy with anti-viral drugs and exposure to therapeutic vaccines.  Approximately 350 million people worldwide are chronically infected with HBV.  Thus, the HBV market represents a multi-billion dollar opportunity, particularly given the limitations of currently-available therapeutic regimes.  There is an unmet medical need for HBV patients, especially for patients with chronic HBV infection, and any new medicine with increased efficacy and/or safety profile will be in high demand.

8.     ARC-520 is currently being tested for its effectiveness in using RNAi to halt the production of hepatitis B genes, which will reduce the number of infectious hepatitis B particles.

9.     As *TheStreet.com*'s Adam Feuerstein wrote in August 2014:

With the viral load reduced, a patient's own immune system can re-activate and kill the remaining hepatitis B virus. Arrowhead hopes to demonstrate treatment with ARC-520 can lead to a "functional cure"

3

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

for hepatitis B. Current treatments for hepatitis B such as interferon or antivirals sold by Gilead Sciences GILD and Bristol-Myers Squibb BMY work by reducing viral load but don't help many patients achieve a cure.

10.    The measure of effectiveness of ARC-520 is to have a log reduction and duration of reduction of hepatitis B surface antigens ("HBsAG"), which measure the presence of hepatitis B in the body.[1]

11.    Tekmira, ISIS Pharmaceuticals, Inc., GlaxoSmithKline, and Alnylam are among the drug companies competing with Arrowhead in what has been described as the "cure HBV race."

12.    Defendants were – and are – motivated to win the "cure HBV race" by beating Arrowhead's competitors to market with a successful product.  The winner of the clinical trial race to commercialize the first RNAi-based compound stands to pioneer a market category that could become a new class of drugs and produce revenues exceeding $1 billion by 2020, according to one projection.

13.    In March 2013, the Company announced that HBsAG levels in a chronically-infected chimpanzee dosed with ARC-520 were reduced ("knocked down") by 80 to 95%, or nearly one log.

---

[1] The term "log" refers to the use of a logarithm to the base 10 to measure antiviral activity. Thus, a 90% reduction of the viral load would be a 1–log reduction, a 99% reduction would be a 2–log reduction, a 99.9% reduction would be a 3–log reduction, and so on.

4

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

14.    A 90% reduction, like the one touted by Defendants, has been described as the benchmark for companies competing to develop RNAi-based treatments for HBV.

15.    On March 24, 2014, the Company announced the commencement of the "Phase IIa" study on ARC-520, which tested the drug in humans.  The Phase IIa study examined the enrolled hepatitis B patients and assigned them randomly to either receive ARC-520, at doses of 1 mg/kg or 2 mg/kg or a placebo.

16.    Unlike the chimpanzee study of ARC-520, which featured two doses of 2 mg/kg and 3 mg/kg, the Phase IIa participants received a lower, single dose of 1 mg/kg or 2 mg/kg.

17.    The chimpanzee study owed its much-vaunted success to its two-dose structure: at the time the second 3mg/kg dose was administered, the HBsAg levels had only declined by approximately 50%.  The second dose substantially increased the overall viral knockdown.

18.    Defendants misrepresented the chimpanzee study at the time it was announced, and continued to do so during the Class Period, when the chimpanzee study was frequently – and falsely – invoked as a precursor to the Phase II trials of ARC-520.

19.    On August 12, 2014, the first day of the Class Period, Defendants held

5

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

a conference call to report on Q3 2014 earnings and the progress of the Phase IIa study.   During this call, Defendants made materially false and misleading statements and/or failed to disclose the true viral reduction level that ARC-520 can induce in human beings, representing that its viral reduction was similar to the chimpanzee result (0.8 log reduction) and closer to 1 log (90% reduction), when:

- the chimpanzee study was a 2 mg/kg and 3 mg/kg, two-dose trial, unlike the 1 mg/kg or 2 mg/kg one-dose Phase IIa trial, and hence capable of a bigger knockdown; and

- no such result was even discernable based on the blinded nature of the then-available data.

20.   On October 8, 2014, the Company announced the results of its Phase IIa study, revealing that ARC-520 dosed at 2 mg/kg only induced a 0.3 log reduction in HBsAG (approximately 50%) – far short of what Defendants previously suggested.

21.   On this news, the Company's stock fell $5.48 per share, or almost 44%, on extraordinary volume from its previous closing price to close at $7.03 per share on October 8, 2014.  Shares have never fully recovered.

22.   The next day, October 9, Defendant Anzalone attempted to assuage investor fury by issuing an "open letter to shareholders" which characterized the events leading up to the collapse of Arrowhead's share price as a "misunderstanding" in need of clarification.   In so doing, Anzalone inadvertently

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

admitted the misleading nature of his Class Period statements.  Arrowhead stock slipped further, to $6.92.  The share price of Arrowhead common stock has never recovered.

23.    Defendants had several motivations to commit fraud.  First, Defendants were motivated to pull away from the competition posed by other drug companies and getting ARC-520 to market as quickly as possible by demonstrating a "functional cure" for HBV that was overwhelmingly effective at a low dose.

24.    Second, Defendants were also motivated to raise funds from investors on the basis of ARC-520's prospects.  In October 2013, shortly after the announcement of the chimpanzee trial, Arrowhead closed a Private Investment in Public Equity (or "PIPE") sale with net proceeds of $60 million, after deducting commissions and other offering expenses payable by the Company.

25.    These motivations prompted Defendants to recklessly gamble on a single-dose trial of ARC-520, which they then hyped to the market based on blinded data.

26.    Third, Defendants were also motivated to commit fraud to reap large profits in insider sales.  Indeed, four of the five Individual Defendants sold Arrowhead stock during the Class Period while in possession of material, inside information, and often at suspicious times and in suspicious amounts.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

## **JURISDICTION AND VENUE**

27.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

28.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

29.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) as a substantial part of the conduct complained of herein occurred in this District.

30.    In connection with the acts, conduct and other wrongs alleged herein, defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

31.    Plaintiff purchased Arrowhead common stock during the Class Period and has suffered damages as set forth in the certification submitted in connection with Plaintiff's motion for appointment as lead plaintiff.

32.    Additional named Plaintiffs Christian and Julia Stout purchased

8

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

Arrowhead common stock during the Class Period and have suffered damages as set forth in their certification submitted in connection with their motion for appointment as lead plaintiff.

33. Defendant Arrowhead Research Corporation, originally incorporated in South Dakota in 1989 and reincorporated in Delaware in 2000, purports to be a biopharmaceutical company developing targeted RNAi therapeutics. The Company's principal executive offices are located at 225 South Lake Avenue, Suite 1050, Pasadena, California 91101. During the Class Period, the Company's stock traded on the NASDAQ Stock Market under the symbol "ARWR."

34. Defendant Christopher R. Anzalone ("Anzalone") has served as the Company's President and CEO at all relevant times.

35. Defendant Bruce D. Given ("Given") has served as the Company's COO and Head of Research and Development at all relevant times. On August 15, 2014, shortly after the Company's first misstatements to investors, Defendant Given sold 25% of his holdings in Arrowhead common stock for a total of $70,000. On September 26, 2014, just before the truth began to emerge about ARC-520, Defendant Given sold 10% of his holdings in Arrowhead common stock for a total of $30,000.

36. Defendant Kenneth A. Myszkowski ("Myszkowski") has served as

9

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

the Company's director at all relevant times.

37.     Defendant Charles P. McKenney ("McKenney") has served as the Company's director at all relevant times.

38.     Defendant David L. Lewis ("Lewis") has served as served as the Company's Chief Scientific Officer at all relevant times.

39.     Defendants Anzalone, Given, Myszkowski, McKenney, and Lewis are collectively referred to hereinafter as the "Individual Defendants."

40.     Each of the Individual Defendants:

a)     directly participated in the management of the Company;

b)     was directly involved in the day-to-day operations of the Company at the highest levels;

c)     was privy to confidential proprietary information concerning the Company and its business and operations;

d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

f)     approved or ratified these statements in violation of the federal securities laws.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

41.   As officers, directors, and controlling persons of a publicly-held company whose common stock is and was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ Global Select and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate accurate and truthful information promptly with respect to the Company's financial condition and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

42.   Defendant Arrowhead and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

## BACKGROUND

**The FDA New Drug Approval Process**

43.   In the United States, pharmaceutical development and marketing is regulated by the FDA, an agency of the U.S. Department of Health and Human Services.  The modern regulatory regime was enacted in 1962, after Thalidomide, a sleeping pill, caused birth defects in thousands of babies.  In reaction to this tragedy, Congress passed the Kefauver-Harris Amendments to the Food, Drug and Cosmetic Act (the "FDCA") requiring that any company that wanted to market a

pharmaceutical product in the United States (in industry parlance, a "sponsor") had

to obtain prior approval from the FDA, and that the approval had to be based upon

substantial scientific evidence demonstrating that the product was safe and

effective for its intended use in human beings.

     44.    The FDCA, as amended, requires the Commissioner of the FDA to

refuse any drug application if:

- "he has insufficient information to determine whether such drug is safe for use under such conditions;" or

- "there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof."

21 U.S.C. § 355(d)(4)-(5).

     45.    The FDA is only permitted to consider clinical evidence to be

"substantial," and thus satisfy the FDCA, if it:

consist[s] of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof.

21 U.S.C. § 355(d).

     46.    Well-controlled clinical investigations measure the subject drug

12

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

against a control group, which is provided either a placebo or another recognized drug for comparison. Moreover, well-controlled clinical investigations generally are conducted in a "double-blinded" manner, meaning that the tests are designed so that the study participants and the investigators (as well as the sponsor and associated research organizations) do not know whether each participant has been provided the candidate drug or is a member of the control group. Double-blinding is intended to minimize test bias and error – even unconscious error – that can arise when the participant and/or investigator have knowledge of the assigned treatment. 21 C.F.R. § 312.23.

47. Prior to conducting any clinical research in humans, a sponsor must screen the proposed drug (or biologic) for toxicity with animal studies, and file an Investigational New Drug ("IND") application with the FDA. Although there are technically three types of INDs, virtually all drugs are developed under the standard development IND (also known as an investigator IND).[2] An IND application includes the following information:

(a)   <u>animal pharmacology and toxicology studies</u> sufficient to

---

[2] The other two types of INDs are treatment INDs, for experimental drugs showing promise in clinical testing for serious or immediately life-threatening conditions while the final clinical work is conducted and the FDA review takes place, and emergency use INDs, for experimental drugs in emergency situations that do not allow time for submission of an IND under standard procedures.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

permit an assessment as to whether the product is reasonably safe for initial testing in human beings.  Any previous experience with the drug in human beings (such as use in foreign countries) also must be included.

(b)   Manufacturing information describing the composition, manufacturer, stability, and controls used for manufacturing the drug substance and the drug product.  This information is assessed to ensure that the company can adequately produce and supply consistent batches of the drug.

(c)   clinical protocols and investigator information including sufficient detail regarding the proposed protocols for clinical studies to assess whether the initial-phase trials will expose human subjects to unnecessary risks.

21 C.F.R. § 312.23.  The sponsor must also commit to obtain informed consent from the research subjects, to obtain review of the study by a local institutional review board ("IRB"), and to adhere to the investigational new drug regulations. *Id.*  After filing an IND, the sponsor must wait 30 days before commencing human clinical trials.

48.   The sponsor, not the FDA, is responsible for determining the design of clinical trials and the protocols for each trial.  If a sponsor wants the FDA to

14

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

agree to the sufficiency of a particular protocol, the sponsor may request a Special Protocol Assessment pursuant to 21 U.S.C. § 355(b)(5)(C).  Under this provision, the FDA and sponsor meet to discuss the sponsor's proposed protocols, and reduce any agreements to writings that become part of the administrative record.  Such agreements may not be changed except by mutual consent or under exceptional medical or scientific circumstances.  *Id.*  Arrowhead did not apply for, and did not receive, any Special Protocol Assessments in connection with the Phase II trials of ARC-520.

49.     Sponsors are also responsible for enrolling patients in clinical trials. Enrollment can be a lengthy and expensive part of a clinical trial, especially in a larger trial, a trial for a rare disease, or a trial in a field with other competing studies.  Regardless of where patients are enrolled, a sponsor must ensure that the trial is conducted according to protocol, and must demonstrate benefit to the patient population for which approval is sought.

50.     A sponsor generally conducts clinical trials in three phases.  These phases, which are codified in FDA regulations, are as follows:

- Phase I. Phase I studies "are designed to determine the metabolism and pharmacologic actions of the drug in human beings the side effects associated with increasing doses, and, if possible, to gain early

15

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

evidence on effectiveness."

- <u>Phase II</u>. Phase II studies are "typically well controlled" studies "conducted to evaluate the effectiveness of the drug for a particular indication or indications in patients with the disease or condition under study and to determine the common short-term side effects and risks associated with the drug."[3]

- <u>Phase III</u>. Phase III studies are expanded studies "performed after preliminary evidence suggesting effectiveness of the drug has been obtained, and are intended to gather the additional information about effectiveness and safety that is needed to evaluate the overall benefit-risk relationship of the drug and to provide an adequate basis for physician labeling. Phase 3 studies usually include from several

---

[3] More specifically, there are two types of Phase II studies:

  i. Phase IIa (or "Phase 2a"): Pilot clinical trials to evaluate efficacy (and safety) in selected populations of patients with the disease or condition to be treated, diagnosed, or prevented. Objectives may focus on dose-response, type of patient, frequency of dosing, or numerous other characteristics of safety and efficacy; and

  ii. Phase IIb (or "Phase 2b"): Well-controlled trials to evaluate efficacy (and safety) in patients with the disease or condition to be treated, diagnosed, or prevented. These clinical trials usually represent the most rigorous demonstration of a medicine's efficacy.  Phase IIb trials are sometimes referred to as pivotal trials.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

hundred to several thousand subjects."

21 C.F.R. § 312.21.

51.     When a sponsor believes it has conducted sufficient well-controlled clinical trials, and believes that those trials demonstrate substantial evidence of efficacy and safety consistent with the FDCA, the sponsor may prepare and file an NDA with the FDA seeking approval to the market the subject drug in a specific dose for the treatment of a specific condition or "indication."  The NDA must also specify how the drug will be manufactured, packaged and labeled.  The FDA can only grant approval when presented with scientific evidence meeting the requisite statutory criteria.

**The ARC-520 Studies**

**A.  <u>Preclinical Chimpanzee Study</u>**

52.     In early March 2013, a blogger who had recently attended an RNAi conference in Tokyo reported that Arrowhead's Dr. Lewis presented data on ARC-520 which "include[d] [an] 80% knockdown following a single administration <u>after 3 months</u> in non-human primates."[4] (Emphasis in original).

---

[4] "Functional Cure of Chronic Hepatitis B: RNAi Therapeutics May Be the Only Game in Town (Part II)." The RNAi Therapeutics Blog (Mar. 1, 2013).  Publicly available at:

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

53.     Two weeks later, *BusinessWire* reported that "ARC-520 Induces Greater than 90% Reduction in Circulating HBV DNA after a single dose in Chimpanzee with Chronic HHBV" with a headline exclaiming "*Single injection at low end of the projected therapeutic dose range*[.]"[5]

54.     On March 25, 2013, Arrowhead formally announced new preclinical data showing that a "low dose" (not numerically specified in the announcement) of ARC-520 induced rapid and deep reductions in viral particles and key viral antigens ("knockdowns") in a single chimpanzee chronically infected with HBV since 1979.   Arrowhead claimed that the "low dose" of ARC-520 led to an approximately 90% (1 log) knockdown in HBsAg in the tested primate.

55.     In contrast to Paragraphs 52 to 54 above, the chimpanzee study involved **two** doses of ARC-520 (the first one at 2mg/kg followed by a second at 3mg/kg before the HBsAg knockdown at 2mg/kg had leveled off).   At the time the (second) 3mg/kg dose was administered, the HBsAg levels had only declined by

http://rnaitherapeutics.blogspot.de/2013/03/today-i-will-explain-why-i-believe-that.html

[5] "Arrowhead RNAi Candidate ARC-520 Induces Greater than 90% Reduction in Circulating HBV DNA in Chimpanzee with Chronic Hepatitis B" *BusinessWire* (Mar. 14, 2013).  Publicly available at:

http://www.businesswire.com/news/home/20130314005338/en/Arrowhead-RNAi-Candidate-ARC-520-Induces-Greater-90#.VPShQyx2IYs

18

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

50%, not 90%.

56.     In discussing the chimpanzee study, Defendant Anzalone expressly interpreted the results as suggesting a functional cure for HBV in *human beings*:

> It was the first large primate to be treated with ARC-520, and **its viral and s-antigen loads were many orders of magnitude higher than what we expect to see in humans. Even with this high bar, we showed that a low dose was effective and extremely well tolerated. There is currently no way to reliably knock down key HBV antigens, thought to be critical to achieving a functional cure of the disease. Our data in multiple rodent models and now in a chimpanzee with chronic HBV infection suggest that ARC-520 may be able to provide this.** We believe this is very important and positions us well for our planned clinical trials this year.

(Bold added).

57.     The Company further stated that the chimpanzee study "may be predictive of a therapeutic dose range to be identified in upcoming clinical trials expected to start in the middle of [2013]."

## B. Phase I Study

58.     In the Fall of 2013, Arrowhead ran a Phase I clinical trial on healthy adult volunteers to assess the safety of ARC-520 at a variety of doses.  The study successfully enrolled all 36 subjects (24 received ARC-520, 12 placebo) at a single center in Melbourne, Australia.   Subsequently, Arrowhead claimed that all participants had received their full assigned dose and that none dropped out of the

19

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

study because of side effects.

59.    At this point, as Luke Timmerman of *xconomy.com* noted, the stakes were high:

> Of course, the task in front of Arrowhead now gets much tougher. The company is gearing up to build on its body of evidence with a clinical trial in the first half of 2014 that should provide the first inkling of whether its drug works for patients with hepatitis B. The Phase 2a study will randomly assign patients to a single intravenous dose of the Arrowhead drug and an antiviral called entecavir, to see how well, and for how long, it can suppress the expression of what's known as the hepatitis B surface antigen, compared to patients on a placebo. If that study goes well, *Arrowhead has said it will be prepared to roll quickly* into the next phase, a bigger Phase 2b study that will gauge safety and effectiveness at sites in the U.S., western Europe, Asia, and other parts of the world.

(Emphasis added).

## C. **Phase II Studies**

60.    In March 2014, Defendants initiated a Phase IIa clinical trial in Hong Kong of ARC-520 designed to evaluate the depth and duration of HBsAg decline in response to a single dose of ARC-520.

61.    The Phase 2a study was a multicenter, randomized, double-blind, placebo-controlled, dose-escalation study to determine the depth and duration of HBsAg reduction after a *single* intravenous dose of ARC-520 in combination with

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

entecavir in patients with chronic HBV infection. [6]  Single doses of ARC-520 were evaluated at up to two ascending doses of 1.0 mg/kg and 2.0 mg/kg.

62.     At each of the two dose levels to be evaluated, a cohort of 8 patients were to be enrolled with 6 being dosed with ARC-520 and 2 being dosed with placebo.  This study was to be conducted in adult male and female patients aged 16 to 65 years with immune active chronic HBV infection, HBeAg negativity, and ongoing entecavir therapy.

63.     On April 1, 2014, Arrowhead announced that the first cohort of 8 patients has been fully enrolled and dosed.

64.     The trial began dosing the second cohort in May 2014.

65.     Arrowhead claimed to have completed dosing of 1.0 mg/kg and 2.0 mg/kg. in June 2014, at which time the Phase 2a study remained double-blinded (though cohorts one and two have since been unblinded).

66.     Subsequently, Arrowhead escalated dosing to 3.0 mg/kg. and 4.0 mg/kg., respectively.   Arrowhead has refused to release the unblinded data for these cohorts.

67.     Also in June of 2014, the Company came under additional pressure to

---

[6] Entecavir (abbreviated "ETV"), is an oral antiviral drug used in the treatment of hepatitis B virus (HBV) infection.
*See* http://packageinserts.bms.com/pi/pi_baraclude.pdf

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

move ARC-520 toward FDA approval quickly.   Alnylam, an Arrowhead competitor, announced its exclusive control of a US patent, acquired through its purchase of Merck's RNAi drug assets earlier in the year, that it claimed was a necessary piece of intellectual property for any group looking to develop an siRNA-based treatment for hepatitis B virus infection – including Arrowhead. According to market watchers, "ARC520 by Arrowhead infringes the newly issued patent (US 8,618,277)."[7]  Alnylam's plans to file an IND on behalf of its own HBV candidate in 2015 added to the perception that it sought to eliminate the competition, including Arrowhead and Tekmira, prior to their getting HBV drugs approved.

68.   On December 19, 2014, Arrowhead filed an IND to begin a Phase 2b Multiple-Dose Study of ARC-520 at 2.0 mg/kg and 4.0 mg/kg, based on a parallel study design.[8]

69.   On January 12, 2015, the FDA verbally informed the Company in a preliminary call of a partial clinical hold, and that it was cleared to begin a modified multiple-dose study of ARC-520 in patients with chronic hepatitis B

[7]  *The RNAi Therapeutics Blog*. "Alnylam Pulls Chair from Underneath Arrowhead Research." (June 12, 2014).

[8] A parallel group design is an experimental study design in which each subject is randomized to one of two or more distinct treatment/intervention groups. Those who are assigned to the same treatment are referred to as a treatment group.

22

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

infection.  The FDA requested that the Company start the multiple-dose study at just 1 mg/kg of ARC-520 rather than the proposed parallel study design of 2 and 4 mg/kg, and requested additional information be provided to the FDA.  The additional information included a final study report from the single-dose Phase 2a study in patients who received 1-4 mg/kg ARC-520. The FDA also requested a final study report from an ongoing multiple-dose non-clinical study. The FDA committed to providing the Company with a letter detailing its thoughts and requests within 30 days.  To date, Arrowhead has not made that correspondence public.

## **CONFIDENTIAL WITNESSES**

70.    CW1 was Chief Business Officer at Arrowhead from November 2011 to May 2014 and reported directly to Defendant Anzalone.

71.    CW1 said that the Company did not intend to license its crown jewel, ARC 520.

72.    CW1 stated that Defendant Given was the central player behind the team developing ARC-520.

73.    According to CW1, ARC-520 constituted Arrowhead's first foray into clinical trials.

74.    CW 1 stated that the Company held science meetings about once a

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

quarter at its Madison, Wisconsin, location relating to clinical progress, which were presided over by Defendant Given .

75.    There can be an interim look for blinded trials, but such an interim look is usually built into a protocol, and an interim look was not in the ARC 520 protocol accordingly to CW1.   Therefore, CW1 explained, it is improper to speculate about clinical trial results because, the integrity of the data set would be compromised, and such speculation would not really tell you anything because it is a blinded trial.

76.    CW1 stated that predictions for a major reduction, say, a 10-log reduction, would be fanciful until real data was generated.

77.    CW1 stated that, in addition to the subject, investigator and investigator's team being masked, the Company also is blinded because you put together a randomization code and basically everything's blinded, so you really do not know the drug effect until the trial is complete.

78.    CW2 worked for Arrowhead as Program Manager of Clinical Research from 2007 through the end of 2013.

79.    CW2 was first employed at an Arrowhead subsidiary, Calando Pharmaceuticals.  In 2009, CW2's employment status transferred to Arrowhead.

80.    CW2 was the Clinical Program Manager for the early ARC-520

24

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

studies, including the Phase 1 safety trial in Australia, with healthy volunteers and into the beginning of Phase 2a in Hong Kong, to test for efficacy at different doses.

81.  During CW2's tenure at Arrowhead, CW2 was based in Pasadena and reported to Thomas Schluep, formerly Arrowhead's Executive Director of Clinical Operations (now VP Project Management), who in turn reported to Defendant Given.

82.  As an outside consultant for Arrowhead, CW2 reported to Caroline Laplaca, Arrowhead's new Executive Director of Clinical Operations.  Diamond Martin, who remains employed by Arrowhead, replaced CW2 inside the Company.

83.  CW2 said that given the timing of the ARC-520 Phase 2a study, only partial data from the second cohort would have been available at the time Defendants CEO Anzalone and Given provided an update to investors in August 2014.

84.  As the trial proceeds, one can guess about efficacy, but you cannot really tell because it a blinded study, CW2 said.

85.  CW2 said it was possible the first data set from Phase 2a looked encouraging, but that the efficacy tests in the ARC-520 trial protocol were not finished until about 90 days after treatment. Therefore, the data available at two months would have been incomplete.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

86.     CW2 was confident Arrowhead did not have the full set of efficacy data out of the second cohort (in August).  CW2 suspected Defendants would have been looking at only minimal data when they were made their statements about ARC 520.

87.     CW2 stated that Defendant Given tends to be somewhat aggressive in his timeline and projections.

88.     In addition, CW2 stated that while Cohorts 1 and 2 of Phase IIa were in process in Hong Kong, Phase 1 safety testing was ongoing in Australia.

## MATERIALLY FALSE AND MISLEADING
## SATEMENTS MADE DURING THE CLASS PERIOD

89.     The Class Period begins on August 12, 2014 when the Company issued a press release providing an update on the Phase IIa study of ARC-520, which was also filed on Form 8-K with the SEC.  The press release touted that the ARC-520 response in human hepatitis B patients was similar to the chimpanzee results, stating in relevant part:

ARC-520 Phase 2a Study Update

- Completed dosing of 1 mg/kg and 2 mg/kg dose cohorts;

- Initial blinded data suggest that the magnitude of HBsAg knockdown is similar to non-human primate studies, including the chronically infected chimpanzee reported on previously;

- Duration of knockdown appears to be substantially more sustained than in non-human primates, with patients in the 2 mg/kg group still demonstrating substantial knockdown after 8 weeks, which is the most recent time point available;

- HBsAg levels appear to continue to decline in a number of patients at the 8 week time point in the 2 mg/kg group;

- Based on initial review, dosing less frequent than once monthly will be explored in Phase 2b;

- ARC-520 continues to be well tolerated, with no dropouts or serious adverse events reported;

- The overall rate of AEs has been lower in the Phase 2a than in the Phase 1 normal volunteer study and safety labs continue to show no indication of end organ toxicity;

- Enrolled and dosed additional subjects at 3 mg/kg in the still open normal volunteer study and the dose performed well, without detected differences from safety and tolerability results at the other doses. Overall AEs do not appear to be increasing in frequency or severity with dose;

- Received IRB and DSMB approvals to proceed and began enrolling an additional dose cohort at 3 mg/kg in the Phase 2a patient study.

90.     The statements contained in Paragraph 89 above were materially misleading when made because they omitted the following material adverse information necessary to make the statements not misleading under the circumstances in which they were made: (a) that the Phase IIa study protocol did not include an "interim look" or any other basis for Defendants' purported analysis

27

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

of still-blinded, incomplete data; (b) that the "magnitude of HBsAg knockdown" was not "similar to non-human primate studies, including the chronically infected chimpanzee reported on previously" because the magnitude of HBsAg knockdown in the chimpanzee was the direct result of its receiving a second, 3mg per kg dose; (c) that the "duration of knockdown" was not "substantially more sustained than in non-human primates" because those primates were subject to a different dosing regimen over a longer period of time; and (d) that differing dose protocols rendered the Phase IIa and the chimpanzee studies fundamentally different.

91.    On that same day, Arrowhead held a conference call to discuss the Third Quarter ("Q3") 2014 earnings results and the progress of the clinical data for the Phase IIa study of ARC-520 collected at that point.    Defendants Given, Anzalone, and Myszkowski were on the call.

92.    During the conference call, Defendant Anzalone made the following initial remarks concerning the Phase IIa study, which touted the reduction ability of ARC-520 in humans:

> As you know, earlier this year we initiated a dose finding Phase 2a study designed to inform a multi-dose Phase 2b study. Our two primary goals were to identify a dose that, A, induces a 90% reduction of circulating s-antigen after a single administration and B, provides durable enough knockdown to enable once per month dosing. Given our studies in multiple animal models, we were quite confident that we could achieve this, but just did not know what that dose would be

28

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION<br>OF THE FEDERAL SECURITIES LAWS

in humans.

Our interim results have been extremely exciting. We completed dosing of 1 and 2 milligrams per kilogram in June and those studies still blinded, several important conclusions may already be drawn. We are seeing clear knockdown in both groups and duration of that knockdown has been substantially longer than we expected.

We currently have data from the 2 milligrams per kilogram cohort as far out as two months after dosing and in these patients we perceive -- and in the patients we perceive as having received ARC-520, we still see substantial knockdown at this time point.

….

We see substantial opportunity to demonstrate deep knockdown, because of the steep dose response curve observed in non-human primates.

93.    The statements contained in Paragraph 92 above were materially misleading when made because they omitted the following material adverse information necessary to make the statements not misleading under the circumstances in which they were made: (a) that Defendants never identified, in "multiple animal models" or otherwise, a dose of ARC-520 that induces a 90% reduction of circulating s-antigen after a single administration and/or provides durable enough knockdown to enable once per month dosing; (b) that the Phase IIa study protocol did not include an "interim look" or any other basis for Defendants' purported analysis of still-blinded, incomplete data; and (c) that differing dose

29

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

protocols rendered the Phase IIa study and the Company's "non-human primate[]" studies fundamentally different.

94.     On the same call, Defendant Given made the following remarks expounding on the results and suggesting that the ARC-520 response in human hepatitis B patients was similar to the chimpanzee results:

> We have surface antigen data for all patients into 2 mg per kg dose group through six weeks and for five of eight patient's we have data through eight weeks.

> Again with the caveat that the data is still blinded we believe the knockdown is clearly deeper in this group versus 1 mg per kg and at eight weeks the patients we perceive is having received active drug so surprisingly large reductions in surface antigen.

> Overall, duration of knockdown appears to be substantially more sustained in humans compared to the non-human primates we have studied at the same doses. For the depth of knockdown appears to be similar in magnitude with what we see in non-human primates of same doses, including the HBV infected chimpanzee presented at AASLD last year.

> *****

> So how should we think about these results? The dose range for knockdown in humans appears to be similar to that seen in nonhuman primates, including the previously reported HBV infected chimpanzee.

95.     The statements contained in Paragraph 94 above were materially misleading when made because they omitted the following material adverse

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

information necessary to make the statements not misleading under the circumstances in which they were made: (a) that the 2 mg per kg dose cohort did not experience anything that might reasonably be termed "surprisingly large reductions in surface antigen"; (b) that the Phase IIa study protocol did not include an "interim look" or any other basis for Defendants' purported analysis of still-blinded, incomplete data; (c) that the "duration of knockdown" was not "sustained in humans compared to the non-human primates we have studied at the same doses" because those primates were subject to a different dosing regimen over a longer period of time; (d) that the "depth of knockdown" was not "similar in magnitude with" the chimpanzee study boasting a nearly 1-log knockdown as the direct result of a second dose not administered in the Phase IIa; and (e) that differing dose protocols rendered the Phase IIa and the chimpanzee studies fundamentally different.

96.     With regards to the ability of ARC-520 to achieve higher than a 0.8 log reduction, Defendant Anzalone had the following exchange with analyst Michael Yee of RBC Capital Markets expressing his confidence in achieving such reduction level:

Michael Yee - RBC Capital Markets
Yeah. Hi. Good afternoon. Thanks guys. A couple of questions, first on your ongoing Phase 2a study. You should have qualified 1 mg and

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

2 mg curves, people are implying that 2 mgs is around 0.8 log reduction like the animal study. But what is your confidence that 3mgs is going to be greater than 0.8. Are you just comparing that to the current time point and the drop you've seen in the time point in the 2 mgs. How confident are you that, that will be greater than a 1 mg -- excuse me, 1 log?

And then going forward, since we're trying to ultimately get functional here in the Phase 2b study, how confident are you in a functional cure if you're not above 1 log. And how many doses will you get and what time points are you looking at your -- to actually look at the functional cure?

Dr. Christopher Anzalone - President and CEO
Sure, I'll take a crack and I'll hand it over to Bruce as well. Regarding our confidence level in achieving the log knockdown with 3 mgs/kg, we feel pretty good about that. What we saw in one 2 mgs/kg is that the depths of knockdown seems to track reasonably well with nonhuman primate models. But of course the durability of the fact is, it's substantially longer. And so that that gives us -- that gives us good confidence that 3 mgs/kg will give us good deep knockdown.

97.     The statements contained in Paragraph 96 above were materially misleading when made because they omitted the following material adverse information necessary to make the statements not misleading under the circumstances in which they were made: (a) that the Phase IIa study protocol did not include an "interim look" or any other basis for Defendants' purported analysis of still-blinded, incomplete data; (b) that in regard to the 2 mgs/kg cohort, "the depths of knockdown" did not "track reasonably well with nonhuman primate models" where the chimpanzee study boasted a nearly 1-log knockdown as the

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

direct result of a second dose not administered in the Phase IIa; (c) that the "durability" of knockdown was not "substantially longer" than in the chimpanzee study, which featured a different dosing regimen over a longer period of time; and (d) that differing dose protocols rendered the Phase IIa and the chimpanzee studies fundamentally different.

98.    Defendant Anzalone also had the following exchange with analyst Alethia Young of Deutsche Bank touting ARC-520 achieving a 1-log reduction:

> Alethia Young - Deutsche Bank
> Great, thanks for taking my question, and congrats on the progress. I just wanted to ask about the 1 log theory again. Do you still stand by the 1 log knockdown, if you're seeing a longer duration of response? And then the second question is, run us through like why you believe 1 log is irrelevant (indiscernible) time point period right now, when you're basically at maybe 0.8, 0.7 right now and then I have one quick follow-up.
>
> Dr. Christopher Anzalone - President and CEO
> Sure. It's good question. Thanks very much Alethia. We think that that is an aggressive bogie and it is not clear to what we actually need to reach that level of knockdown. Having said that we think that we can certainly get there so we're more comfortable if we have it. The reason that we have, we have stuck to that bogie, is that the only thing that gives any kind of (indiscernible) semi reliable functional cures is interferon. After a year of interferon, about 10% of patients will reach a functional sure and all those patients who do get to that functional cure will see about half a log reduction in s-antigen in around 12 weeks and around one log after 24 weeks.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

99.    The statements contained in Paragraph 98 above were materially misleading when made because they omitted the following material adverse information necessary to make the statements not misleading under the circumstances in which they were made: (a) that the "1 log theory" was not an "aggressive bogie," but an improper transposition of data from the two-dose chimpanzee study onto the one-dose Phase IIa; and (b) that Defendants had no reasonable basis to believe they could achieve a 1-log knockdown in the Phase IIa because differing dose protocols rendered the Phase IIa and the chimpanzee studies fundamentally different.

100.    Following the dissemination of the August 12, 2014 press release, Adam Feuerstein of *The Street* summed up the market reaction to Defendants' statements:

> In terms of Wall Street expectations, a lot of investors were looking for a 1.0 log reduction in HBsAG from this ARC-520 study, although the company and sell-side analysts were framing a win with a 0.5 to 1.0 log reduction.  **If ARC-520 accomplished an 0.8 log reduction, as today's announcement suggests**, it will likely be viewed positively.
>
> HBsAG levels continue to decline in during the study and Arrowhead says the drug appears safe enough to dose another cohort of hepatitis B patients with a higher 3 mg dose of ARC-520. **On its call, Arrowhead expressed confidence in achieving a 1 log reduction in HBsAG with the 3 mg dose.**

34

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

(Bold added).

## THE TRUTH SLOWLY BEGINS TO EMERGE

101.   On October 8, 2014, Arrowhead issued a press release stating that the Company was presenting the data for its Phase IIa study on ARC-520 at the American Association for the Study of Liver Disease ("AASLD") meeting to be held on November 7-11, 2014.

102.   Along with this announcement, Arrowhead published a late-breaking abstract for the AASLD Meeting.  The abstract revealed that there was a 39% reduction of the hepatitis B's HBsAG when a 1 mg/kg dose was administers and a 51% reduction of HBsAG when a 2 mg/kg dose was administered.

103.   The 51% of HBsAG for the 2 mg/kg dose of ARC-520 equates to only a 0.3-log reduction – falling far short of the near 1-log reduction Defendants had previously represented.

104.   On that same day, *TheStreet.com*'s Feurstein published an article detailing the Company's disappointing results, which states:

Arrowhead Research Sinks on Disappointing Hepatitis B Drug Data
Adam Feuerstein
10/08/14 – 10:38 AM EDT

Arrowhead Research (ARWR) shares were sliding hard on disappointing data from its experimental hepatitis B therapy ARC-

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

520, released at 10 a.m. EST.

**In an ongoing phase II study, ARC-520 dosed at 2 mg/kg induced a 0.3 log log reduction in HBsAG, which is a measure of the presence of hepatitis B virus in the body. The observed treatment effect for ARC-520 at this dose is much lower than investors expected. When Arrowhead first announced results from this study in August, the company didn't provide specific numbers but hinted that the viral reduction was closer to (but not quite) 1 log. A 0.3-log reduction is nowhere close to 1-log reduction, which explains why Arrowhead stock is selling off.**

Arrowhead shares were down 30% to $8.80.

The specific data on ARC-520 disclosed this morning was contained in a late-breaker abstract for the American Association for the Study of Liver Disease (AASLD) annual meeting, which is being held in November.

The phase II study of ARC-520 in hepatitis B patients is ongoing and Arrowhead is exploring higher doses of the drug, hoping to see a more robust effect. But results from higher doses of ARC-520 have not yet been announced.

Here is the nut graph from the ARC-520 AASLD late-breaker abstract which caused Arrowhead shares to sink:

> ARC-520 activity is assessed by measuring percent change of quantitative HBsAg decline from baseline. For patients receiving ARC-520 in cohort 1, mean nadir HBsAg was -39% (range -22 to -57) with a mean change on day 85 of -31% (range -14 to -39). For patients receiving ARC-520 in cohort 2, mean nadir HBsAg was -51% (range -46 to -59) with a mean change on day 85 of -22% (range -7 to -40). For cohort 2, the percent reduction in HBsAg was statistically significant vs placebo for Days 3 through 43 post dose. This is the first

36

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

time that a reduction in HBsAg mediated through RNA interference has been shown in chronic HBV patients.

**There is a formula to convert percent change in quantitative HBsAg decline from baseline into a log reduction. The 51% reduction disclosed in the abstract for the 2 mg/kg dose of ARC-520 equates to a 0.3-log reduction.**

(Emphasis added)

105.   Later that same day, Feuerstein of *TheStreet.com* published another article further commenting on the Company's disappointing results, which states in relevant part:

*Blame Arrowhead Management Entirely for Today's Epic Collapse*

10/08/14 – 3:52 PM EST

Lay all the blame for Arrowhead Research's (ARWR) spectacular hepatitis B implosion today at the feet of CEO Chris Anzalone and the rest of the company's management team.

All CEOs of publicly traded companies must manage investor expectations. **For CEOs of early, development-stage biotech companies like Arrowhead, making sure Wall Street isn't delivered a nasty surprise is absolutely crucial.** Credibility lost is very difficult to retrieve. Yet for some inexplicable reason, Anzalone totally botched the job.

**For months, Anzalone and his team knew ARC-520 dosed at 1 mg/kg and 2 mg/kg yielded 0.2-log and 0.3-log reductions in hepatitis B viral load. Publicly and privately, however, Arrowhead executives led investors to believe that ARC-520 was more potent, achieving viral load reductions in the range of 0.7 log or higher.**

Arrowhead could have been honest with investors about ARC-520's mediocre performance at the two lowest doses. **The company could**

37

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION<br>OF THE FEDERAL SECURITIES LAWS

**have told investors, "We're not where we want to be with ARC-520 dosing and viral load reductions yet, but we think we can get there soon at higher doses and here's why."**

**If Arrowhead had played fair and conservatively earlier this year, perhaps the stock price might not have reached $26 in March like it did.** Maybe the company's valuation bump would have been more modest. But I'm also more certain Arrowhead wouldn't trade at a year low like it is now because investors were misled ….

I asked Arrowhead management to explain their actions but received no response.

(Bold added).

106.   W. Thomas London, a physician and hepatitis researcher at Fox Chase Cancer Center, who has collaborated with Baruch Blumberg, the discoverer of HBV, said of Arrowhead's early data: **"I'm not overwhelmed … because the drug did not reduce the level of [the protein] to zero with one injection,"** which was the promise of the Phase 2a trial that Defendants hawked all along.  There was still a lot of viral material present and "presumably a lot of virus still being made. I would call it a marginal result." (Bold added)

107.   Following this negative news, the Company's stock fell $5.48 per share, or 44%, on volume that was more than 14 times its daily average, to close at $7.03 per share on October 8, 2014, subsequently falling to $6.92 the next day.

108.   After Arrowhead's about-face disclosure regarding ARC-520 on October 8, analysts were quick to lower their valuation of Arrowhead stock.  For

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

example, on October 8, 2014, Deutsche Bank published an analyst report about Arrowhead's bombshell.  The report stated, in part:

> We are disappointed the [sic] management handling of expectations around the Ph 2a trial. Given the results we see risk from 1) longer timelines, 2) potential competitors & 3) risk of using higher doses…. we are reducing the TP to $20 from $45 previous to account for the increased risk. Maintain Buy….

> We think that higher doses than 2mg will certainly be needed, so we await data on 3mg. Mgmt reiterates at 2mg is right at onset of effect. We think expectations at the high end were around .5 logs. What is status on 3mg and 4mg? As of a couple weeks ago, the co said that they had 2 pts left on the 3mg. We would assume it's close to done now. The 4mg healthy is complete. Mgmt says timelines for 3mg at AASLD will be very tight. Gating step for 4mg is they need to get approval, protocol amend, and present 3mg safety to dsmb. What to expect at AASLD? Mgmt suggests there will be further data presented at AASLD during the late breaker. We will be looking for curves at these 2 doses, any more detail on safety to make sure the high doses are safe. We do think AASLD has a high std for data presented as LB so these data are meaningful for the space.

109.   On October, RBC Capital Markets ("RBC") also published a report drastically cutting its price target for Arrowhead:

> Our view: Early knockdown data today suggests lower end efficacy and less likely chance of cures...and that cure data is far off...so lowering PT to $9 (from $35) on lower probability of success and higher risk.

110.   On October 9, in an apparent attempt to stanch the financial bleeding unleashed by Arrowhead's epic investor letdown (and square the circle of his previous misrepresentations), Defendant Anzalone published an "Open Letter to

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

Shareholders" containing the following claims and/or admissions:

- That "the market clearly expected something different [following the August 12 statements] and/or misunderstood the data";

- That while Arrowhead's "goal was to identify a dose of ARC-520 capable of achieving HBsAg reduction of around 1 log (corresponding with 90% knockdown) after a single administration" it was, in fact, "a somewhat arbitrary goal since it is unknown what level of HBsAg reduction is necessary to de-repress the immune system and potentially enable a functional cure";

- That "[a]t the time of our August update, the study was still blinded and ongoing but we wanted to provide some information about what we were seeing. Recognizing that we were still blinded to which patients had received ARC-520 and which received placebo, we described the apparent HBsAg knockdown at 1mg/kg as 'modest' and 2mg/kg as 'moderate.'"

- That "[t]he study is now unblinded with respect to the first two cohorts and, as was reported in the recent AASLD abstract, we now know that the mean peak knockdown was 39% at 1 mg/kg and 51% at 2 mg/kg. … Since the August conference call, we have remained consistent with that terminology"; and

- That "the chimpanzee with chronic HBV that we treated received two doses of ARC-520: 2 mg/kg on day 1 and then 3 mg/kg on day 15. Prior to receiving the second dose, HBsAg was reduced about 50% from baseline. To repeat, we reported mean peak HBsAg knockdown of 51% in patients receiving 2 mg/kg in the Phase 2a while the chimpanzee knockdown at that dose was approximately 50%. The chimpanzee ultimately experienced 80-85% reduction in HBsAg, but only after receiving the 3 mg/kg dose … As with the chimpanzee study, this certainly feels similar in magnitude to the 51% HBsAg knockdown we saw in patients receiving 2 mg/kg ARC-520."

40

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

111.   In fact: (a) Defendants' statements with respect to the Phase IIa study were not consistent, and in fact resulted in the negative market reaction described at Paragraph 107 above, because the  study protocol did not include an "interim look" or any other basis for Defendants' purported analysis of still-blinded, incomplete data; (b) the 1-log reduction touted by Defendants was not an "arbitrary goal" but an attempt to mislead investors by ascribing the results of the two-dose chimpanzee study to the one-dose Phase IIa study; (c) Defendants were not "consistent" in their uses of the term "modest": on the August  call, Defendants discussed "modest" results for the 1 mg/kg cohort only while falsely claiming results on par with the chimpanzee study, but in October, Anzelone used "modest" to describe results far below those of the chimpanzee study for the Phase IIa study overall; and (d) Defendants repeatedly compared the chimpanzee and the Phase II studies in August without ever qualifying that the comparison was limited to **half the chimpanzee study**, *i.e.,* the first 2 mg/kg dose.

## **INSIDER SALES**

112.   As alleged herein, Arrowhead and the Individual Defendants acted with *scienter* in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the

41

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding Arrowhead, their control over, and/or receipt and/or modification of Arrowhead's allegedly materially misleading statements and/or their associations with the Company, which made them privy to confidential proprietary information concerning the financial condition and results of operations, and the effectiveness of internal controls, of the Company and its subsidiaries, participated in the fraudulent scheme alleged herein.

113. Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The fraudulent scheme described in this Complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants.

114. Numerous Arrowhead insiders – including four of five Individual Defendants – sold Company shares while in the possession of material, inside information:

115.    d

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

| Sale Date | Insider | Title | Amount | Price | Proceeds | Percentage Sold |
|---|---|---|---|---|---|---|
| 8/15/2014 | Given, Douglas | Director | 5,000 | $13.90 | $69,500.50 | 20% |
| 9/26/2014 | Given, Douglas | Director | 2,000 | $15.24 | $30,480.00 | 9% |
| 9/30/2014 | Lewis, David | Chief Scientific Officer | | $15.02 | $225,350.00 | 100% |
| 10/1/2014 | McKenney, Charles | Director | 2,500 | $14.70 | $36,748.50 | 12% |
| 8/15/2014 | Myszkowski, Kenneth Allen | Chief Financial Officer | | $14.02 | $560,860.00 | 40% |

116. These sales were suspicious in amount and/or timing.

117. Defendant Given's August and September sales were only one and six weeks, respectively, after Defendants' misstatements made during a conference call on August 12, 2014.

118. Defendant Lewis's sales were suspicious in amount and timing. Specifically, Lewis's September 2014 sales occurred about six weeks after Defendants' August 12, 2014 misstatements artificially inflated Arrowhead stock.

119. Defendant McKenney's sales were suspicious in timing. McKenney sold approximately 12% of his holdings about six weeks after Defendants' August

43

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

statements artificially inflated Arrowhead stock.

120.   Defendant Myszkowski's sales were suspicious in timing and amount. Myszkowski sold approximately 40% of his Arrowhead holdings on August 15, 2014 – only three days after Defendants' August 12, 2014 misstatements artificially inflated Arrowhead stock.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

121.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Arrowhead securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.   Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

122.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Arrowhead securities were actively traded on the NASDAQ.   While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

proposed Class.  Record owners and other members of the Class may be identified from records maintained by Arrowhead or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

123.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

124.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

125.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Arrowhead;

- whether the Individual Defendants caused Arrowhead to issue false and misleading financial statements during the Class Period;

45

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Arrowhead securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

126. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

127. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Arrowhead securities are traded in efficient markets;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ, and was covered by multiple

46

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased and/or sold Arrowhead securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

128.  Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

129.  Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## FIRST CLAIM

**Violation of Section 10(b) of
The Exchange Act and Rule 10b-5
Against All Defendants**

130.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

131.  During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1)

47

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other members of the Class to purchase Arrowhead securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Defendants took the actions set forth herein.

132.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Arrowhead securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

133.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Arrowhead as specified herein.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

134.   These Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Arrowhead's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Arrowhead and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Arrowhead securities during the Class Period.

135.   Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) Individual Defendants, by virtue of their responsibilities and activities as  senior officers and/or directors of the Company, were privy to and participated in the creation, development and reporting of the Company's financial condition; (3) Individual Defendants enjoyed significant personal contact and familiarity with the

other Defendants and were advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

136.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true results of the ARC-520 clinical trials and Arrowhead's corresponding future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements and omissions regarding the ARC-520 clinical trials throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

137.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Arrowhead securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of Arrowhead's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Arrowhead securities during the Class Period at artificially high prices and were damaged upon the disclosure of the Defendants' wrongdoing.

138.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Arrowhead's true operational condition, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Arrowhead's securities, or, if they had acquired such securities during the Class Period, they would not have done so at

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

the artificially inflated prices that they paid.

139.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

140.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period when the Defendants' wrongdoing was disclosed to the market causing the price of Arrowhead common stock to decline.

141.   This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against The Individual Defendants

142.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

143.   Individual Defendants acted as controlling persons of Arrowhead within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, ownership and contractual rights, and

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

144.  In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

145.  As set forth above, Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

146.  By virtue of their positions as controlling persons, Individual

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

147. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## THIRD CLAIM

### Violation of Section 20(a) of
### The Exchange Act Against Defendants Given,
### Myszkowski, Lewis and McKenney

148. This claim is brought against the defendants named in this Count. This Count is also brought on behalf of all Class members who purchased Arrowhead common stock contemporaneously with sales of Arrowhead common stock by these defendants.

149. By virtue of their position as senior insiders of Arrowhead, these defendants were in possession of material, non-public information about the Company at the time of their sales of Arrowhead stock.

150. By virtue of their participation in the scheme to defraud investors described herein, and their sales of stock while in possession of material, non-

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

public information about the adverse information detailed herein, these defendants violated the Exchange Act and applicable rules and regulations thereunder.

151.   Plaintiffs and all other members of the Class who purchased shares of Arrowhead stock contemporaneously with the sales of Arrowhead stock by these defendants: (a) have suffered substantial damages in that they paid artificially inflated prices for Arrowhead stock as a result of the securities law violations described herein; and (b) would not have purchased Arrowhead stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements.

152.   These defendants are required to account for all such stock sales and to disgorge his profits and ill-gotten gains

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

a)   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

b)   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

c)   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

and other costs; and

     d)    Awarding such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  March 6, 2015       **GLANCY BINKOW & GOLDBERG LLP**

                           */s/ Lionel Z. Glancy*
                           Lionel Z. Glancy
                           Michael Goldberg
                           Robert V. Prongay
                           1925 Century Park East, Suite 2100
                           Los Angeles, California 90067
                           Telephone: (310) 201-9150
                           Facsimile: (310) 201-9160
                           info@glancylaw.com

                           ***Liaison Counsel for Plaintiff***

                           **POMERANTZ LLP**
                           Patrick V. Dahlstrom, *Pro Hac Vice*
                           Louis C. Ludwig
                           10 South LaSalle Street, Suite 3505
                           Chicago, Illinois 60603
                           Telephone:  (312) 377-1181
                           Facsimile:  (312) 377-1184
                           pdahlstrom@pomlaw.com
                           lcludwig@pomlaw.com

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

**POMERANTZ LLP**
Jeremy A. Lieberman, *Pro Hac Vice*
Francis P. McConville, *Pro Hac Vice*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
jalieberman@pomlaw.com
fmcconville@pomlaw.com

***Lead Counsel for Plaintiff***

**BERNSTEIN LIEBHARD LLP**
Joseph R. Seidman, Jr.
10 East 40th Street
New York, New York 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

***Additional Counsel for Plaintiff and***
***Counsel for Additional Named Plaintiffs***
***Christian and Julia Stout***

57

CONSOLIDATED AMENDED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

## PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07

I, the undersigned, say:

I am a citizen of the United States and admitted to practice before this Court, *Pro Hac Vice*. I am over the age of 18 and not a party to the within action. My business address is Pomerantz LLP, Ten South La Salle Street, Suite 3505, Chicago, Illinois 60603. The business address of my local affiliated counsel is Glancy Binkow & Goldberg LLP, 1925 Century Park East, Suite 2100, Los Angeles, California 90067.

On March 6, 2015, I caused to be served the following document:

## CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS

By posting the documents to the ECF Website of the United States District Court for the Central District of California, for receipt electronically by the parties as listed on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on March 6, 2015, at Los Angeles, California.


*s/ Patrick V. Dahlstrom*
Patrick V. Dahlstrom

# Exhibit A

## Service List

**David E Azar**

dazar@milberg.com,cchaffins@milberg.com,jconte@milberg.com,ckiyotoki@milberg.com

**David E Bower**

dbower@faruqilaw.com,brohr@faruqilaw.com,mblackman@faruqilaw.com

**Patrick V Dahlstrom**

pdahlstrom@pomlaw.com

**Christopher D Dusseault**

cdusseault@gibsondunn.com,ljoy@gibsondunn.com

**Lionel Zevi Glancy**

lglancy@glancylaw.com

**Michael M Goldberg**

mmgoldberg@glancylaw.com,dmacdiarmid@glancylaw.com,info@glancylaw.com

**Francis M Gregorek**

gregorek@whafh.com

**Dean J Kitchens**

dkitchens@gibsondunn.com,MOstrye@gibsondunn.com

**Jeremy A Lieberman**

jalieberman@pomlaw.com

**Marisa C Livesay**

livesay@whafh.com,davanzo@whafh.com,boyles@whafh.com

**Louis C Ludwig**

lcludwig@pomlaw.com

**Betsy C Manifold**

manifold@whafh.com,davanzo@whafh.com,cabrera@whafh.com,campuzano@whafh.com

**Francis P McConville**

fmcconville@pomlaw.com

**Alexander K Mircheff**

amircheff@gibsondunn.com,mostrye@gibsondunn.com,inewman@gibsondunn.com,cnowlin@gibsondunn.com,mpulley@gibsondunn.com

**Robert Vincent Prongay**

rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com

**Rachele R Rickert**

rickert@whafh.com,cabrera@whafh.com,cothran@whafh.com

**Laurence M Rosen**

lrosen@rosenlegal.com

**Evan Jason Smith**

esmith@brodsky-smith.com

**Avi N Wagner**

avi@thewagnerfirm.com,anwageneresq@hotmail.com

**Jeff S Westerman**

jwesterman@jswlegal.com

299181.1 ARROWHEAD