UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

IN RE ARROWHEAD RESEARCH
CORPORATION SECURITIES
LITIGATION

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. 2:14-cv-07890-CBM-ASx

ORDER  [72]

The matter before the Court is Defendants' Motion to Dismiss the Consolidated Amended Complaint (Dkt. No. 69 "CAC") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Upon consideration of the papers and oral argument held on January 5, 2016, the Court grants Defendants' motion.  The Court also incorporates by reference Exhibits 1 through 8, 10 through 13, and 15 through 16, which were attached to Defendants' motion.

1

## I.   DEFENDANTS' REQUEST FOR JUDICIAL NOTICE OR INCORPORATION BY REFERENCE OF EXHIBITS

In moving to dismiss Plaintiffs' Consolidated Amended Complaint, Defendants requested that the Court "take judicial notice of, or consider under the doctrine of incorporation by reference," sixteen separate documents, Exhibits 1 through 16. (Request for Judicial Notice at 1.)  At the hearing, Plaintiffs withdrew their objections to Defendants' request as it pertained to Exhibits 4, 5, 6, 7, and 10, and Defendants withdrew their request as it pertained to Exhibit 9.  Plaintiffs also clarified at the hearing that they did not intend to name Douglas Given, whose Securities and Exchange Commission ("SEC") Form 4 was labeled as Exhibit 14, as a Defendant.   Upon consideration of the remaining exhibits and the arguments presented, the Court incorporates by reference Exhibits 1 through 8, 10 through 13, 15 and 16. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## II.   FACTUAL BACKGROUND

Plaintiffs filed this federal securities putative class action on behalf of all persons and entities, other than Defendants, who purchased the common stock of Arrowhead Research Corporation ("Arrowhead") during the period August 12, 2014 through October 8, 2014. (CAC ¶ 1.)  Plaintiffs allege that Arrowhead and certain Arrowhead officers, directors, and controlling persons, violated Sections 10(b), 20(a), and 20A of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1; and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  (*Id*. ¶¶ 33-39, 130-52.)

Plaintiffs' allegations are as follows.  Defendant Arrowhead is a publicly-held, biopharmaceutical company in the business of developing RNA Interference therapeutics.   (*Id*. ¶ 2.)   RNA Interference therapeutics can combat viruses by suppressing the expression of certain genes, thereby destroying specific micro-RNA molecules. (*Id*.)  Arrowhead's "lead clinical candidate" is a drug called ARC-520, an

RNA Interference therapeutic that targets the hepatitis B virus ("HBV").  (*Id*. ¶ 4.) ARC-520 works by halting the production of hepatitis B genes, resulting in a reduction in the number of infectious hepatitis B particles in an infected person's body.  (*Id*. ¶¶ 6, 8.)

The presence of hepatitis B in a person's body is measured by the presence of hepatitis B surface antigens ("HBsAg").  (*Id*. ¶10.)  Therefore, the effectiveness of ARC-520 at reducing the production of hepatitis B genes is evaluated by comparing the level of HBsAg in a person infected with hepatitis B before and after being administered the drug.  (*Id*.)  A 90 percent reduction in HBsAg as a result of receiving the drug ARC-520, referred to as a 1-log knockdown in HBsAg, is considered the "benchmark" for companies competing to develop RNA Interference therapeutics to treat hepatitis B.  (*Id*. ¶¶ 10, 13 n.1, 14.)

## A.   ARC-520 Preclinical Studies

In 2013, Arrowhead conducted a preclinical study of ARC-520, testing its effectiveness on a chimpanzee infected with hepatitis B, the results of which were reported in printed and online publications.  (*Id*. ¶ 13; *see also* Exhibit 4, Oct. 2013 Abstract.)  In March of 2013, a blogger reported that Arrowhead's data showed that the non-human primates that received ARC-520 experienced an "80% knockdown following a single administration [of ARC-520] after 3 months."  (CAC ¶ 52 (emphasis in original).)  Two weeks later, *BusinessWire* reported that "ARC-520 Induces Greater than 90% Reduction in Circulating [hepatitis B] DNA after a single dose in [a] Chimpanzee with Chronic [hepatitis B]."  (*Id*. ¶ 53.)  On March 25, 2013, "Arrowhead formally announced that "a 'low dose' (not numerically specified in the announcement) of ARC-520 induced rapid and deep reductions in viral particles and key viral antigens ('knockdowns') in a single chimpanzee chronically infected with [hepatitis B]" and "led to an approximately 90% (1-log) knockdown in HBsAg in the tested primate."  (*Id*. ¶ 54.)

In May 2013, Arrowhead published additional study results, one of which showed that dosing non-human primates with 2 milligrams per kilogram ("mg/kg") of a drug similar to ARC-520 reduced the HBsAg in those animals by 30 to 60 percent. (Exhibit 6, May 2013 Study.)

In October 2013, Arrowhead published an abstract in *Hepatology*, the official scientific journal of the American Association for the Study of Liver Diseases ("AASLD"), regarding its preclinical studies of ARC-520 on the chimpanzee and other animals. (Exhibit 4.)  The abstract explains the process used in the study, stating that Arrowhead gave the chimpanzee two doses of ARC-520, one at 2 mg/kg and the second at 3 mg/kg, and that the chimpanzee experienced a total reduction in HBsAg of between 81 and 96 percent after the second dose. (*Id.*)  On November 3, 2013, Arrowhead published an abstract poster regarding the study, again explaining that the chimpanzee received two doses of ARC-520 – one at 2 mg/kg and the second at 3 mg/kg. (Exhibit 5, Nov. 2013 Abstract.)   Both the October and November publications include graphs indicating the amount the HBsAg in the chimpanzee was reduced after each dose of ARC-520, and how long those results lasted. (*Id.*; Exhibit 4.)

**B.      ARC-520 Phase 2a Study**

On March 24, 2014, Arrowhead announced that it would commence a Phase 2a clinical study of ARC-520 to study the efficacy of ARC-520 in human participants infected with hepatitis B. (CAC ¶ 15.)  During the study, the Phase 2a participants received one of three doses: either a placebo, or a single dose of ARC-520 at either 1 mg/kg or 2 mg/kg. (*Id.* ¶¶ 15, 16, 61.)

**C.      Defendants' Statements Regarding the Phase 2a Study Results**

On August 12, 2014, Defendants provided public updates regarding the progress of the Phase 2a Study in both a press release and during a conference call held the same day. (CAC ¶ 19.)  Plaintiffs allege that these statements were materially misleading because they omitted information necessary to make the statements not misleading under

4

the circumstances.

Various analysts reacted to Arrowhead's August 12, 2014 updates regarding the Phase 2a study. One publication, *The Street*, interpreted Arrowhead's statements as "suggest[ing]" that "ARC-520 accomplished an [sic] 0.8 log reduction" and noted that on the call, Arrowhead "expressed confidence in achieving a 1 log reduction in HBsAg with the 3 mg dose." (CAC ¶ 100.) Analyst Michael Yee also published a report on August 12, 2014 stating that Arrowhead reported that the "initial top-line Phase 2a data" show an "[o]verall s-antigen drop is 'similar to non-human primate' studies which implies for investors around -0.8 log reduction." (Exhibit 10.)

**D.     Arrowhead Announces the Phase 2a Study Results**

On October 8, 2014, Arrowhead announced the results of the Phase 2a Study in an abstract published with AASLD. (CAC ¶ 20; *see also* Exhibit 7, Oct. 8 Abstract.) In pertinent part, the results demonstrated that Phase 2a participants who received the single 2 mg/kg dose of ARC-520 experienced a 0.3 log, or 50% reduction in HBsAg. (CAC ¶¶ 20, 55; *see also* Exhibit 7.) Plaintiffs allege that this result was "far short of what Defendants previously suggested" on August 12, 2014 in the press release and during the conference call. (CAC ¶ 20.) As a result, Arrowhead's stock price dropped by almost 44 percent on extraordinary value. (*Id.* ¶ 21.)

The same day, *The Street* published an article "detailing [Arrowhead's] disappointing results," stating that "[t]he observed treatment effect for ARC-520 at this dose is much lower than investors expected." (*Id.* ¶ 104.) It further stated that "[w]hen Arrowhead first announced results from this study in August, the company didn't provide specific numbers but hinted that the viral reduction was closer to (but not quite) 1 log." (*Id.*) "A 0.3-log reduction," the article stated, "is nowhere close to 1-log reduction, which explains why Arrowhead's stock is selling off." (*Id.*)

Later that day, *The Street* published another article "blam[ing] Arrowhead [m]anagement [e]ntirely" for Arrowhead's stock "[c]ollapse." (*Id.* ¶ 105.) Plaintiffs

also allege that W. Thomas London, a physician and hepatitis researcher, stated that he was "'not overwhelmed'" by Arrowhead's early data "'because the drug did not reduce the level of [the protein] to zero with one injection,'" which Plaintiffs allege "was the promise of the Phase 2a trial that Defendants hawked all along." (*Id.* ¶ 106.)

Plaintiffs allege that Deutsche Bank also published an analyst report on October 8, stating that it was "disappointed" in Arrowhead's handling of expectations regarding the Phase 2a trial and reduced the target price of the stock. (*Id.* ¶ 108.) RBC Capital Markets also allegedly published a report cutting its target price for Arrowhead. (*Id.* ¶ 109.)

**E.       Defendant Anzalone's October 9, 2014 Letter to Shareholders**

On October 9, 2014, Defendant Anzalone issued an "open letter to shareholders" seeking to "assuage investor fury." (CAC ¶ 22; *see also id.* ¶ 110.) In the letter, Defendant Anzalone states that he wrote to "clarify recent events" and stated that the "market reaction" to the Phase 2a results on October 8 "took [Arrowhead] by surprise." (Exhibit 8, Oct. 9 Letter.) Defendant Anzalone clarified that Arrowhead felt that its prior communications properly reflected the data it was seeing in the initial phases of the study, but that "the market clearly expected something different and/or misunderstood the data." (CAC ¶ 22; Exhibit 8.) Plaintiffs allege that this statement was akin to an admission that the August 12 statements were misleading, and that as a result, Arrowhead's stock price "slipped further" and has never fully recovered. (CAC ¶¶ 20-22.)

**F.       Insider Trading**

Plaintiffs allege that three of the five individually named Defendants sold shares in Arrowhead while in the possession of material, inside information between August and October 2014. In support of this claim, they state that

- Defendant Myszkowski, Arrowhead's Chief Financial Officer, sold 40 percent of his shares on August 15, 2014, at $14.02 per share, making

6

$560,860.00 in proceeds;

• Defendant Lewis, Arrowhead's Chief Scientific Officer, sold 100 percent of his shares on September 30, 2014, at $15.02 per share, making $225,350.00 in proceeds; and

• Defendant McKenney, an Arrowhead Director, sold 12 percent of his shares on October 1, 2014, at $14.70 per share, making $36,748.50 in proceeds.

(CAC ¶¶ 114-15.)

## III.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To comply with the pleading requirements of Federal Rule of Civil Procedure 8(a), the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 8(a). A formulaic recitation of the elements of a cause of action and legal conclusions will not suffice. *Twombly*, 550 U.S. at 555. Instead, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Iqbal*, 556 U.S. at 678.

In considering motions brought pursuant to Rule 12(b)(6), courts accept as true all well-pleaded allegations of material fact and construe them in a light most favorable to the non-moving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-32 (9th Cir. 2008). When deciding whether to dismiss a complaint alleging a violation of Section 10(b) of the Exchange Act and Rule 10b-5, "courts must consider

the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

**B. Federal Rule of Civil Procedure 9(b)**

Plaintiffs alleging violations of Section 10(b) of the Exchange Act and Rule 10b-5 must satisfy Federal Rule of Civil Procedure 9(b), as well as the heightened pleading requirements of the PSLRA. *Tellabs*, 551 U.S. at 321; *see also In re Daou Sys., Inc.*, 411 F.3d 1006, 1014-15 (9th Cir. 2005).

## IV. DISCUSSION

Plaintiffs allege that Arrowhead and the individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5, and that certain individual Defendants violated Section 20(a) and Section 20A of the Exchange Act.

**A. Section 10(b) and Rule 10b-5**

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful "for any person … [t]o use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." SEC Rule 10b-5 implements Section 10(b) by declaring it unlawful:

    (a)    To employ any device scheme, or artifice to defraud;

    (b)    To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

8

17 C.F.R. § 240.10b-5. The provisions therefore "afford[] a right of action to purchasers or sellers of securities injured by its violations." *Tellabs*, 551 U.S. at 318. The elements of a securities fraud claim under Section 10(b) and Rule 10b-5 are:

> (1) a material misrepresentation or omission of fact;
>
> (2) scienter;
>
> (3) a connection with the purchase or sale of a security;
>
> (4) transaction and loss causation; and
>
> (5) economic loss.

*In re Daou Sys., Inc.*, 411 F.3d at 1014 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)); *see also Zucco Partners*, *LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009).

It is well established that at "the pleading stage, a complainant stating claims under Section 10(b) and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA." *Zucco*, 552 F.3d at 990; *see also In re VeriFone Holdings Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). Private securities fraud complaints are also "subject to the 'more exacting pleading requirements' of the PSLRA," which require plaintiffs to plead both falsity and scienter "with particularity." *Reese v. Malone*, 747 F.3d 557, 568 (9th Cir. 2014) (citing *Zucco*, 552 F.3d at 990); *see also* 15 U.S.C. § 78u-4(b)(1)-(2).

Defendants argue that Plaintiffs have failed to set forth factual allegations sufficient to allege a violation of Section 10(b) and Rule 10b-5 for three reasons: (i) failure to identify an actionable statement of a material misrepresentation or omission; (ii) failure to show the required scienter; and (iii) failure to demonstrate loss causation.

### i. Misrepresentation and Materiality

To plead a misrepresentation under Section 10(b) and Rule 10b-5, the complaint

9

must allege that the defendant "(A) made an untrue statement of material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading."  15 U.S.C. § 78u-4(b)(1).  A statement is misleading under Section 10(b) and Rule 10b-5 "if it would give a reasonable investor the 'impression of a state of affairs that differ in a material way from the one that actually exists.'"  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal citation omitted).

To satisfy the heightened pleading standards, the complaint must "*specify each statement* alleged to have been misleading, [and] the reason or reasons *why* the statement was misleading."  *Id*. § 78-4(b)(1)(B) (emphasis added).  The specificity requirement "prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful."  *Metzler Invest. GMBH v. Corinthian Coll., Inc.*, 540 F.2d 1049, 1061 (9th Cir. 2008) (emphasis in original).

The alleged misrepresentation or omission of fact must also be material.  *In re Cutera Sec. Litig*., 610 F.3d 1103, 1108 (9th Cir. 2010).  "A statement is material when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'"  *Reese*, 747 F.3d at 568 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1976)) (internal quotation marks omitted).  To plead "materiality" on a federal securities fraud claim, "the complaint's allegations must 'suffice to raise a reasonable expectation that discovery will reveal evidence satisfying the materiality requirement, and to allow the court to draw the reasonable inference that the defendant is liable.'"  *Id.* (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309 (2011)).

Plaintiffs have filed suit based on four categories of statements made by Defendants on August 12, 2014 that Plaintiffs claim were misleading: (1) statement that the percent of the reduction in HBsAg in the Phase 2a participants was "surprisingly

large"; (2) statements that Arrowhead's goal was to identify a dose of ARC-520 that would achieve a 1-log or 90 percent reduction in HBsAg after a single dose; (3) all statements based on incomplete and blinded data; and (4) statements comparing the results of the Preclinical and Phase 2a studies. (*See* CAC ¶¶ 90, 93, 95, 97, 99.)

### *Statement Describing Results as "Surprisingly Large"*

During the conference call, Defendant Given is alleged to have stated in relevant part:

> Again with the caveat that the data [are] still blinded[,] we believe th[at] knockdown is clearly deeper in this group versus 1 [milligram per kilogram. A]nd at eight weeks[,] the patients we perceive [a]s having received active drug [show] *surprisingly large reductions in surface antigen.*

(*Id.* ¶ 94 (emphasis added) (modifications consistent with Exhibit 2 at 4).)[1] Plaintiffs allege that this statement was misleading because "the 2 mg per kg dose cohort did not experience anything that might be reasonably termed 'surprisingly large reductions in surface antigen.'" (*Id.* ¶ 95.) However, Plaintiffs do not allege with particularity or in non-conclusory terms "the reason or reasons *why*" those results could not be considered surprisingly large. 15 U.S.C. § 78u-4(b)(1); *see also Metzler*, 540 F.3d at 1061. Therefore, Plaintiffs have not alleged sufficient facts from which the Court could conclude that this statement was misleading under Section 10(b) and Rule 10b-5.

### *Statements of Future "Goals"*

Plaintiffs allege that the following statement made by Defendant Anzalone was misleading:

> As you know, earlier this year[,] we initiated a dose finding Phase [IIa] study designed to inform a multi-dose Phase [IIb]

---

[1] The Court has the benefit of both Plaintiffs' allegations of statements made during the conference call, as provided in the CAC, and the transcript of the conference call, of which the Court has taken judicial notice. Therefore, for purposes of this discussion, the Court has made modifications to Plaintiffs' allegations, in brackets, so that they are consistent with the transcript.

> study. Our two *primary goals* were to identify a dose that, A, *induces a 90% reduction of circulating s-antigen after a single administration*[;] and B, *provides durable enough knockdown to enable once per month dosing*. Given our studies *in multiple animal models*, we were quite confident that we could achieve [these], but just did not know what that dose would be in humans.

(CAC ¶ 92 (emphasis added) (modification consistent with Exhibit 2 at 3).) Plaintiffs allege that this statement was misleading because "Defendants never identified, in 'multiple animal models' or otherwise, a dose of ARC-520 that induces a 90% reduction of circulating s-antigen after a single administration and/or provides durable enough knockdown to enable once per month dosing." (*Id*. ¶ 93.)

Similarly, Plaintiffs allege that the following statement, made by Defendant Anzalone in response to the question posed by analyst Alethia Young "about the 1 log theory" was misleading. In that exchange, Ms. Young asked whether Arrowhead "stand[s] by the 1 log knockdown," (Exhibit 2 at 8), and Defendant Anzalone answered

> We think that that is an *aggressive bog*[*ey*,] [in that] it is not clear to [us that] we actually need to reach that level of knockdown. Having said that[,] *we think that we can certainly get there*[,] so we're more comfortable if we have it.

(CAC ¶ 98 (emphasis added) (modification consistent with Exhibit 2 at 8).) Plaintiffs allege that this statement was misleading because the "1 log theory" was actually "not 'an aggressive bog[ey],' but an improper transportation of data from the two-dose chimpanzee study onto the one-dose Phase 2a [Study]." (*Id*. ¶ 99.) Plaintiffs also allege that the statement was misleading because "Defendants had no reasonable basis to believe they could achieve a 1-log knockdown in the Phase 2a because differing dose protocols rendered the Phase 2a and the chimpanzee studies fundamentally different." (*Id*.)

These statements were not misleading under Section 10(b) and Rule 10b-5 because they constituted "forward-looking statements," which are protected by the PSLRA. Under the PSLRA, a forward-looking statement is "any statement regarding

12

(1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003) (citing 15 U.S.C. § 78u5(i)). In relevant part, the PSLRA protects a defendant from liability for making a forward-looking statement so long as the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). If the statement lacks sufficient "cautionary statements," the defendant may still be able to escape liability if "the plaintiff fails to prove that the forward-looking statement … was made with actual knowledge by that person that the statement was false or misleading." *Id*. § 78u-5(c)(1)(B); *see also In re Cutera*, 610 F.3d at 1112.

Here, in addition to making a preliminary overall disclosure at the beginning of the call that statements made during the "call may contain certain forward-looking statements" "with respect to Arrowhead's goals, plans and strategies" (Exhibit 2 at 2), Defendants referred to the 1-log or 90% reduction based on a single dose of ARC-520 throughout the conference call as a "goal" they had not yet achieved. (*See* Exhibit 2.) Although Defendant Anzalone expressed "confidence" in Arrowhead's ability to reach that goal, he cautioned that "ultimately, we just don't know until we're in humans," and stated that the goal was "just speculation" and "an aggressive bogey." (Exhibit 2 at 7.) Defendant Given also stated during the conference call that "the chances are pretty good that 3 milligrams per kilogram gives us what we have been looking for" (*id*.) – a 1-log or 90 percent knockdown – but later cautioned that "any outcome can occur" (*id*. at 9). Further, even if Defendants had not couched their statements with sufficient cautionary language, Plaintiffs have failed to plead sufficient facts regarding whether the statements were made with actual knowledge that they were misleading. *See* 15 U.S.C. § 78u-

5(c)(1)(B)(i).

Therefore, because Defendants' statements regarding the 1-log reduction goal were predictions of future performance, accompanied by cautionary language, and because there is no allegation that Defendants knew they would be misleading, they are protected under the PSLRA.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1328 (2015).

### *Statements Relying on Incomplete and Blinded Data*

Plaintiffs allege that Defendants' statements were based on "still-blinded, incomplete data" and were therefore misleading because the Defendants did not include in their study protocol "an 'interim look' or any other basis for Defendants' purported analysis."  (CAC ¶¶ 90, 93, 95, 97.)  In support of these allegations, Plaintiffs appear to rely on statements made by two "Confidential Witnesses."  (*Id*. ¶¶ 70-88.)  However, Plaintiffs have failed to allege "sufficient factual detail" about each witness's position within Arrowhead that would allow the Court to find that the facts reported are within the "personal knowledge" of each Confidential Witness.  *Zucco*, 552 F.3d at 994 (citing *In re Daou Sys*., 411 F.3d at 1015-16).  Therefore, the Court does not consider Plaintiffs' allegations based on the knowledge of Plaintiffs' two Confidential Witnesses.

Moreover, although Defendants' comments in August 2014 may have been based on blinded and incomplete data, Defendants disclosed that information in the press release and multiple times during the conference call.  (*See* Exhibit 1 at 5; Exhibit 2 at 3, 4, 10, 11.)  Therefore, Defendants have not alleged facts sufficient to find that the August 12, 2014 statements were misleading because they were based on incomplete or blinded data.

### *Statements Comparing Results of the Preclinical and Phase 2a Studies*

On August 12, 2014, Defendants made a number of statements, hypothesizing as to the significance of the results of the Phase 2a study based on trends they had observed after dosing other animals with ARC-520.

14

For example, in the press release, Defendants stated in relevant part:

> Initial blinded data suggest that the magnitude of HBsAg knockdown *is similar to non-human primate studies, including the chronically infected chimpanzee* reported on previously …
>
> Duration of knockdown appears to be *substantially more sustained than in non-human primates*, with patients in the 2 mg/kg group still demonstrating substantial knockdown after 8 weeks, which is the most recent time point available …

(*Id.* ¶ 89 (emphasis added).)

During the conference call, Defendants stated in relevant part:

> We see substantial opportunity to demonstrate deep knockdown, *because of the steep dose response curve observed in non-human primates*.

(*Id.* ¶ 92 (emphasis added).)

> Overall, duration of knockdown appears to be substantially *more sustained in humans compared to the non-human primates* we have studied **at the same doses**. [However,] depth of knockdown appears to be *similar in magnitude* with what we see in non-human primates [at the] same doses, including the HBV [in] infected chimpanzee presented at AALSD last year.
>
> \*\*\*
>
> So how should we think about these results?  The dose range for knockdown in humans *appears to be similar* to that seen in nonhuman primates, including the previously reported HBV infected chimpanzee.

(*Id.* ¶ 94 (emphasis added) (modification consistent with Exhibit 2 at 4).)

> Regarding our confidence level in achieving [a] log knockdown with 3 [milligrams per kilogram], we feel pretty good about that. [The – w]hat we saw in [the 1 milligrams and 2 milligrams per kilogram,] is that the depth[] of knockdown *seems to track reasonably well with non[-]human primate models*.  But of course[,] the durability of [effect] is

15

substantially longer.  And so that gives us [] good confidence that 3 [milligrams per kilogram] will give us good[,] deep knockdown.

(*Id*. ¶ 96 (emphasis added) (modification consistent with Exhibit 2 at 7).)

Plaintiffs allege that it was misleading to compare the results of the Phase 2a study with Arrowhead's previous studies of ARC-520 because Defendants administered the studies differently, including dosing the chimpanzee and human participants at different amounts, rates, and times.  (*See* CAC ¶¶ 90, 93, 95, 97.)  However, scientific abstracts published by Arrowhead in 2013 (*see* Exhibits 4, 5, 6) disclosed these differences and were publicly available.  (CAC ¶¶ 16-17.)  Further, Defendants stated during the conference call that what Defendants found to be similar in the two studies was the percent reduction of HBsAg in both the chimpanzee and humans after they received ARC-520 at the same dose.  (CAC ¶ 94.)  As was publicly available and mentioned during the conference call, the only dose that was the same in the Preclinical and Phase 2a studies was the single 2 mg/kg dose administered in both.  (*See* Exhibits 4, 5.)  At that dose, the chimpanzee experienced a 50 percent reduction in HBsAg, which was similar to the 51 percent reduction experienced by humans "at the same dose."  (*Id*. ¶¶ 17, 20; *see also* Exhibits 4, 5, 7, 8.)  A review of the conference call transcript also demonstrates that Defendants admitted that they had not yet reached their goal of a 1-log reduction in humans as they had in the Preclinical Study conducted on the chimpanzee. (Exhibit 2 at 9-11.)

Considering the allegations as a whole, including the entire transcript of the conference call (Exhibit 2) and the information publicly available regarding the studies (Exhibits 4, 5, 6), Defendants did not omit information that would have "significantly altered the total mix of information available" when it compared the results of Arrowhead's Phase 2a study with its Preclinical studies and made future predictions. *See Reese*, 747 F.3d at 568.

**ii.    Scienter**

"Scienter is defined as 'a mental state embracing intent to deceive, manipulate, or

16

defraud.'" *Reese*, 747 F.3d at 568 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976)).  In order to plead a violation of Section 10(b) and Rule 10b-5, the complaint must plead scienter by alleging "with *particularity* facts giving rise to a *strong inference* that defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A) (emphasis added).  This requirement can be met by alleging that Defendants made misleading statements either "intentionally or with deliberate recklessness."  *In re Daou Sys., Inc.*, 411 F.3d at 1015.

Deliberate recklessness "reflects some degree of intentional or conscious misconduct."  *See id.* (citing *S. Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008)).  "An actor is deliberately reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort."  *Reese*, 747 F.3d at 569.   "'[T]he complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made.'"  *Metzler*, 540 F.3d at 1066 (quoting *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001)).

In 2007 the Supreme Court clarified that it is not enough to plead a "strong inference of scienter" based on allegations "that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind."  *Tellabs*, 551 U.S. at 314.  "Rather," "to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency" this Court "must engage in a comparative evaluation; it must consider, not only the inferences urged by the plaintiff, … but also competing inferences rationally drawn from the facts alleged," *id.*, or other "plausible, nonculpable explanations for the defendant's conduct," *id.* at 323-24.  The "inquiry … is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.* at 322-23 (citing *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir.

17

2002)).  Thus, Plaintiffs "must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id*. at 328.

Plaintiffs allege that scienter is principally established here by three factors: (1) insider trading of Defendants Myszkowski, McKenney, and Lewis; (2) statements made by confidential witnesses; and (3) Defendants' knowledge of, or deliberate recklessness to, the possibility that the statements would mislead investors.  Plaintiffs' allegations, even when taken collectively, do not give rise to a strong inference of scienter sufficient to defeat dismissal given the "competing inferences rationally drawn from the facts alleged." *Talleb*, 551 U.S. at 314; *see also Metzler*, 540 F.3d at 1066.

### *Insider Trading*

"While 'suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter,' such sales only give rise to an inference of scienter when they are 'dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed information.'" *Metzler*, 540 F.3d at 1066-67 (quoting *In re Silicon Graphics Sec. Litig*., 183 F.3d 970, 986 (9th Cir. 1999) (internal citations omitted).  Three factors are relevant to the inquiry: "(1) the amount and percentage of the shares sold; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's trading history." *See id*. at 1067.  Plaintiff has not alleged facts upon which the Court could find that Defendants' stock sales were suspicious and therefore indicative of scienter. *See In re VeriFone Holdings*, 704 F.3d at 704 n.2; *Metzler*, 540 F.3d at 1067 n.11; *Ronconi*, 253 F.3d at 436.

### *Marketing Goals*

Allegations of routine corporate objectives are not sufficient to allege scienter. *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012).  "[T]o hold otherwise would support a finding of scienter for any company that seeks to enhance its business prospects." *Id*.  Therefore, even if Defendants' alleged conduct – making misleading statements about the efficacy of ARC-520 then revealing the true results two

18

months later – could be considered an advantageous business plan, Plaintiffs cannot maintain their allegation of scienter based on allegations that Defendants made the misleading statements intentionally in order to pull away from the competition, market ARC-520 as quickly as possible, and raise funds from investors.

### *Knowledge*

To allege scienter under a "deliberate recklessness" standard and satisfy the heightened pleading requirements of the PSLRA, Plaintiffs were required to allege "some degree of intentional or conscious misconduct" with "particularity." *Reese*, 747 F.3d at 557. Plaintiffs' allegations that Defendants Anzalone and Givens acted with knowledge are conclusory. Plaintiffs cannot rely solely "on allegations that management had an important role in the company" to allege scienter under the PSLRA because the CAC "does not contain additional detailed allegations about defendants' actual exposure to information." *South Ferry LP No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). In such cases, the inference that defendants had knowledge of the relevant facts will not be much stronger, if at all, than the competing inference that defendants remained unaware. *Id*.

### iii.    Loss Causation

"[L]oss causation is the 'causal connection between the defendant's material misrepresentation and the plaintiff's loss.'" *Metzler*, 540 F.3d at 1062 (quoting *Dura Pharm.*, 544 U.S. at 342) (modifications omitted). Loss causation requires particularized "alleg[ations] that the decline in the defendant's stock price was proximately caused by a revelation of fraudulent activity rather than by changing market conditions, changing investor expectations, or other unrelated factors." *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014). A decline in stock price is not enough to establish loss causation; rather, "the plaintiff must plausibly allege that the defendant's fraud was revealed to the market and caused the resulting losses." *Id.* "A complaint fails to allege loss causation if it does not 'provide a defendant with notice of what the relevant

economic loss might be or of what the causal connection might be between that loss and the misrepresentation.'" *Id*. (quoting *Dura Pharms.*, 544 U.S. at 347) (modifications omitted).

Unlike the elements of material misrepresentation and scienter, under Section 10(b) and Rule 10b-5, plaintiffs alleging loss causation need only satisfy Federal Rule of Civil Procedure 8(a)(2)'s pleading requirements to avoid dismissal under Rule 12(b)(6). *Dura Pharms.*, 544 U.S. at 346. Here, Plaintiffs have alleged sufficient facts to demonstrate that the October 8 disclosures caused Arrowhead's stock price to drop because investors had been previously misled by Defendants.

However, because Plaintiffs have failed to allege facts sufficient to satisfy the other pleading requirements of Section 10(b) of the Exchange Act or SEC Rule 10b-5, the Court grants Defendants' motion as to the Plaintiffs' First Claim.

**B.    Section 20(a) of the Exchange Act for Control Person Liability**

Under Section 20(a) of the Exchange Act, an employee of a corporation that violates the securities laws, will be jointly and severally liable to the plaintiff if the plaintiff demonstrates: (1) "a primary violation of federal securities law"; and (2) the defendant employee "exercised actual power or control over the primary violator." *Zucco*, 552 F.3d at 990 (citations omitted); *see also* 15 U.S.C. § 78t(a). While this inquiry "is normally an intensely factual question, . . . Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of Section 10(b)." *Zucco*, 552 F.3d at 990 (internal quotations and citations omitted).

The Court grants Defendants' motion as to the Second Claim because Plaintiffs failed to adequately plead a primary violation of Section 10(b). *Zucco*, 552 F.3d at 990.[2]

---

[2] Plaintiffs also failed to allege facts showing that the non-speaking defendants, Defendants Myszkowski, McKenney, and Lewis, had actual power or control over a speaker with respect to the transaction at issue. *Zucco*, 552 F.3d at 990 (citing *Paracor Fin. Inc. v. GE Capital Corp.*, 96 F.3d 1151, 1163 (9th Cir. 1996)).

**C.     Section 20A of the Exchange Act for Insider Trading**

To plead a violation of Section 20A, 15 U.S.C. § 78t-1(a), a plaintiff must allege that (1) the defendant committed an Exchange Act violation by "purchasing or selling a security while in possession of material, nonpublic information"; and (2) the defendant's trade occurred "contemporaneously" with a complementary trade made by the plaintiff. *Id.*

Plaintiffs fail to allege facts sufficient to plead that Defendants Myszkowski, McKenney, and Lewis engaged in trading that would violate Section 20A because they do not allege that the three defendants were in possession of material, nonpublic information at the time they sold their stocks. *See Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 610 (9th Cir. 2014). Plaintiffs also do not respond to Defendants' argument that Defendant Myszkowski cannot be held liable for insider trading because he made no sale that was "contemporaneous" with a complementary trade made by Plaintiffs. *See In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1205 (C.D. Cal. 2008). Therefore, the Court grants Defendants' Motion as to the Third Claim.

**CONCLUSION**

For the reasons stated herein, the Court **GRANTS** Defendants' motion to dismiss the Consolidated Amended Complaint in its entirety without prejudice.[3] Plaintiffs may file a second amended consolidated complaint no later than **April 8, 2016**.

**IT IS SO ORDERED.**

DATED: March 29, 2016                      CONSUELO B. MARSHALL

                                           UNITED STATES DISTRICT JUDGE

---

[3] To the extent the Court's tentative rulings given at the January 5, 2016 hearing differ, this Order controls.